**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE**

FREDERICK VAUGHN GREENE and      )
TERRI LYNN GREENE,      )
     )
     Plaintiffs      )
     )
     v.      )      CAUSE NO.: 4:06-CV-105-WCL
     )
US DEPARTMENT OF EDUCATION,      )
     )
     Defendant.      )

## REPORT AND RECOMMENDATION

Plaintiffs Frederick Vaughn Greene and Terri Lynn Greene filed a Complaint in their bankruptcy proceeding asking the Bankruptcy Court to "discharge student loan debt, and/or interest and penalties pursuant to 11 U.S.C. 523, and other statutory and constitutional law." Pl. Cmplt. Reference to the Bankruptcy Court was withdrawn, and the case is pending in the United States District Court for the Northern District of Indiana, Hammond Division.

This matter is now before the Court for a Report and Recommendation on a Motion for Summary Judgment or Alternatively Partial Summary Judgment [DE 17], filed by Defendant United States Department of Education on June 29, 2007. As set forth below, the Court recommends that the District Court grant the Motion for Summary Judgment.

## PROCEDURAL BACKGROUND

On July 29, 2005, the Greenes filed a Chapter 7 bankruptcy petition before the United States Bankruptcy Court for the Northern District of Indiana, Hammond Division at Lafayette under Bankruptcy Petition 05-41001. The Greenes were granted a discharge under 11 U.S.C. § 727 on November 7, 2005.

During the pendency of the Bankruptcy Petition, the Greenes filed a Complaint against the United States Department of Education on October 31, 2005, which began Adversary Proceeding Number 05-04045, the case that is now pending before this Court following the withdrawal of reference.  In their Complaint, the Greenes seek a determination that their student loans are dischargeable.  Therein, the Greenes allege that the amounts for which they are allegedly indebted to the Government represent excessive interest and penalties; that they individually and jointly cannot maintain, based on current income and expenses, a minimal standard of living for themselves individually, nor jointly; that additional (unidentified) circumstances exist that indicate that these circumstances will continue to exist for the remainder of the loan period; that the Greenes are the parents of four children; that the expenses of a household of six, with alleged special educational needs (unspecified) of the children ages 5-15 are too large to allow payment of these purported amounts due; and that the Greenes individually and jointly have made good faith efforts to repay these loans.  Count I of the Complaint alleges that the loans constitute an undue hardship on each Plaintiff individually and that the applicable statute of limitations for the collection of these purported debts has expired.  Count II alleges that the excessive interest and penalties are a result of the Government's negligence and that these loans constitute an undue hardship on each Plaintiff individually.  Count III again alleges that the loans constitute an undue hardship on each Plaintiff individually and that the loans should be discharged "by virtue of reparations for slavery and discrimination due and owing to Plaintiffs."  Pl. Cmplt.

On March 20, 2006, while this matter was pending before the Bankruptcy Court, the presiding judge ordered that discovery "shall be completed within 120 days."  On April 5, 2006, the Government issued Requests for Admissions to Frederick Greene and to Terri Greene individually.

The request for admissions to each Plaintiff contained the following language: "[E]ach of the following statements and the genuineness of the following described documents shall be admitted unless appropriate action is taken within the time ordered by the Court, or the time prescribed in Rule 36 of the Federal Rules of Civil Procedure . . . ." Def. Br., Exh. 7, p. 2. The requests for admission also included the following language: "Request for Admissions to be answered fully within the time ordered by the Court, or thirty (30) days if no order shortening time is entered." *Id*. at p. 1.

On April 24, 2006, the Greenes filed a Motion for Withdrawal of Reference. On April 25, 2006, the Bankruptcy Court entered an order requiring the Greenes to pay the filing fee within eight days of the order and that "[t]he failure to do so will result in the current filing being stricken without further notice. The court will take no further action with regard to the current filing and any time limits associated with it, e.g. 11 U.S.C. § 362(e), shall not begin to run until this order has been complied with." Def. Reply, Exh. 13.

On May 17, 2006, the Bankruptcy Court recommended the withdrawal of reference.

On the same day, May 17, 2006, the Government filed a Memorandum in Response to the Motion for Withdrawal of Reference, in which the Government argued that, (1) because Terri Greene had not signed the Motion for Withdrawal of Reference, only Frederick Greene had requested a withdrawal of reference, (2) the Motion for Withdrawal of Reference was untimely because it was not filed within the thirty days that expired on April 19, 2006, and because moving for withdrawal six months after filing the suit was not the first reasonable opportunity to do so, and (3) Frederick Greene has not met his burden of demonstrating that the withdrawal of reference, whether permissive or mandatory, is necessary.

3

On May 18, 2007, the Government filed a Motion for the Bankruptcy Court to amend its recommendation concerning the withdrawal of reference.[1]

On May 22, 2006, Frederick and Terri Greene filed their Answers to Request for Admissions.

On May 25, 2006, the Bankruptcy Court issued a Supplemental Recommendation Concerning Withdrawal of Reference and opined that, because it did not have subject matter jurisdiction over Count III of the Complaint, the order of reference should be withdrawn to allow the Greenes' Complaint to be resolved in a single proceeding before one court.

On May 25, 2006, the Motion for Withdrawal of Reference was transmitted to the United States District Court for the Northern District of Indiana, and the case was renumbered as Cause No. 4:06cv105.

On September 5, 2006, under Cause No. 4:06cv105, the District Court withdrew the reference to the Bankruptcy Court with regard to Adversary Proceeding No. 05-04045, granting the Greene's Motion for Withdrawal of Reference filed in the bankruptcy proceeding.  The District Court order was filed in Adversary Proceeding No. 05-04045 on October 18, 2006, and the adversary case was closed on October 30, 2006.

On June 29, 2007, the Government filed a Motion for Summary Judgment or Alternatively Partial Summary Judgment, a memorandum and exhibits in support, a statement of undisputed

---

[1] The Government's response time to the Motion for Withdrawal of Reference had been extended by the Bankruptcy Court's April 25, 2006 Order postponing ruling on the Motion for Withdrawal of Reference until the Greenes paid the filing fee.  The Bankruptcy Court recognized in its Supplemental Recommendation that its May 17, 2006 Order ruling on the Motion for Withdrawal of Reference had been issued prior to the expiration of the time period for a response brief from the Government, and the Bankruptcy Court considered the Government's response brief in issuing the Supplemental Recommendation.

material facts,[2] and a legally sufficient notice to *pro se* plaintiff of filing of summary judgment to Frederick Greene and Terri Greene individually.  Following two requests for extension of time, on September 19, 2007, the Greenes filed a Response in Opposition to the Motion for Summary Judgment, a memorandum and affidavits in support, and an Objection to the Statement of Undisputed Material Facts.[3]  On October 3, 2007, the Government filed a Reply Brief.

---

[2] In their Objections, the Greenes object to paragraphs 52-60, 64, 69, and 70 on the basis that neither of them had the opportunity under Federal Rule of Civil Procedure 30(d) to review and make changes to the depositions and state that, as of the date of the Objections, neither had been contacted to review the depositions.

In a footnote to the Statement of Material Facts, the Government explains that when the depositions were taken on June 12, 2007, the Greenes did not waive signature at the time of the depositions.  Acknowledging that the Greenes had thirty days after notification by the court reporter to review and make changes to the depositions but recognizing that the deadline for filing dispositive motions was July 2, 2007, the Government cited to the depositions without the Greenes' signatures and represented that the depositions would be filed once reviewed by the Greenes and any necessary modifications to the Government's memorandum would be made.

On January 23, 2008, the Government filed the signed deposition of Frederick Greene, which shows that the deposition was signed on November 2, 2007.  On January 24, 2008, the Government filed the Errata Sheet for the deposition that was executed by Frederick Greene prior to signing the deposition.  The Court has reviewed the Errata sheet and finds that the corrections made by Frederick Greene do not affect the issues on this Motion for Summary Judgment.

On January 23, 2008, the Government filed the unsigned deposition of Terri Greene as well as the certified mailing receipt showing that notice of the deposition of Terri Green was ready for review, that the deposition was sent to her address for her review and signature, and that she did not review and sign the deposition in the time allotted.  On January 24, 2008, the Government filed a copy of the blank Errata Sheet that had been sent to Terri Green with her deposition.

[3] In the document entitled "Objections to Purported Statement of Undisputed Material Facts," the Greens argue that the Government's Statement mischaracterizes the facts of this case as many of the facts therein are in dispute.  The Greenes further object because the Government never met with them to compile this statement.

Local Rule 56.1(a) provides that a party moving for summary judgment must file a "'Statement of Material Facts,' supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence, as to which the moving party contends there is no genuine issue."  Local Rule 56.1.  The Government's Statement of Material Facts was submitted with the requisite supporting evidence, including the Greenes' admissions that are deemed admitted.

The Local Rule goes on to require that "[a]ny party opposing the motion shall, within thirty (30) days from the date such motion is served upon it, serve and file any affidavits or other documentary material controverting the movant's position, together with a response that shall include in its text or appendix thereto a "Statement of Genuine Issues" setting forth, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  *Id.*  The Greenes have filed their Objections, which, although not entitled a "Statement of Genuine Issues," attempt to rebut the Government's Statement of Material Facts.  However, the Greenes' objections are primarily legal arguments and there are no citations to evidence in the Objections other than to the Greenes' Brief.  In support of their Brief, the Greenes do offer three Affidavits.

On November 13, 2007, the Greenes filed a Motion to File an Additional Response, seeking leave of court to file a supplemental response brief to the Motion for Summary Judgment in order to address the impact on this litigation, if any, of the College Cost Reduction and Access Act (Public Law 110-84), which was signed into law on September 17, 2007.  The Court granted the motion and allowed the Greenes up to and including January 14, 2008, in which to file a supplemental response brief to the Government's Motion for Summary Judgment.  However, on January 14, 2008, rather than filing a supplemental response brief, the Greenes filed a Motion to Reopen Discovery.  Finding that the Greenes sought only additional time to discern their legal arguments and that the Greenes did not identify any additional factual matters subject to discovery, the Court denied the motion. The Motion for Summary Judgment is now fully briefed.

On October 31, 2007, the District Court Judge issued an order referring this case to the undersigned Magistrate Judge for a Report and Recommendation.

## ADMISSIONS

In the Motion for Summary Judgment, the Government asks the Court to deem admitted the Requests for Admissions served on the Greenes on April 5, 2006, because the Greenes' responses were untimely.

A failure to respond to a Request for Admission within the thirty days provided for in Rule 36(a) results in an admission of the matters in the Request for Admission, unless there is an agreement by the parties or court order to allow for a longer period of time. Fed. R. Civ. P. 36(a); *see also United States v. Kasuboski*, 834 F.2d 1345, 1349-50 (7th Cir. 1987).  Federal Rule of Civil Procedure 36(a) provides, in pertinent part:

> (1) Scope. A party may serve upon any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to:
>> (A) facts, the application of law to fact, or opinions about either; and
>> (B) the genuineness of any described documents.
>
> (2) Form; Copy of a Document. Each matter must be separately stated. . . .
>
> (3) Time to Respond; Effect of Not Responding.  A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.  A shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court.

Fed. R. Civ. P. 36(a).  Rule 36(b) goes on to explain the effect of an admission:  "A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."  Fed. R. Civ. P. 36(b).  Federal Rule of Bankruptcy 7036 provides that Federal Rule of Civil Procedure 36 applies to requests for admission in adversary proceedings in bankruptcy court.  *See* Fed. R. Bankr. P. 7036.

On April 5, 2006, the Government sent a Request for Admissions to Frederick Greene and a Request for Admissions to Terri Lynn Greene, which the Greenes state in their response brief that they received several days later.  Both documents contained plain statements that each admission would be deemed admitted if not answered within thirty days.  Notwithstanding the stated deadline, the Greenes filed their answers on May 22, 2006, approximately fourteen days past the deadline.

In the interim, Plaintiff Frederick Greene filed a Motion for Withdrawal of Reference in the Bankruptcy Court on April 24, 2006.  Pursuant to the Federal Rules of Bankruptcy Procedure, the filing of a motion for withdrawal of reference does not stay the proceedings before a bankruptcy court absent an order of the bankruptcy judge:

> The filing of a motion for withdrawal of a case . . . shall not stay the administration of the case or any proceeding therein before the bankruptcy judge except that the bankruptcy judge may stay, on such terms and conditions as are proper, proceedings

7

> pending disposition of the motion. A motion for a stay ordinarily shall be presented
> first to the bankruptcy judge.

Fed. R. Bankr. P. 5011.  The next day, on April 25, 2006, the Bankruptcy Court issued an order,

noting that Frederick Greene had filed the Motion for Withdrawal of Reference without paying the

$150.00 filing fee and ordering

> that plaintiff shall fully pay the required fee within eight (8) days of this date.  The
> failure to do so will result in the current filing being stricken without further notice.
> The court will take no further action with regard to the *current filing* and any time
> limits associated with *it*, e.g. 11 U.S.C. § 362(e), shall not begin to run until this
> order has been complied with.

Def. Reply, Exh. 13 (emphasis added).  The Greenes argue that this order suspended all deadlines

associated with the case.  However, the plain language of the order demonstrates that it suspends

only the deadlines associated with "the current filing," which was the Motion for Withdrawal of

Reference that would be stricken if the motion filing fee was not paid.  No other order staying the

entire bankruptcy proceeding pursuant to Rule 5011 was issued as a result of the Motion for

Withdrawal of Reference.  Accordingly, the ongoing discovery, including response deadlines, was

not stayed during the pendency of the Motion for Withdrawal of Reference and the Greenes'

answers were untimely.[4]

In their "Objections to Purported Statements of Undisputed Material Fact," the Greenes also

argue, without legal analysis, that res judicata prevents the Government from relitigating whether

their Answers to the Requests for Admission were untimely.  The Greenes reason that the

Government argued that issue before the Bankruptcy Court and the Bankruptcy Court rejected that

---

[4] The Greenes argue, without citation to law, that the eventual withdrawal of reference by the District Court created a new case in the District Court and that admissions made in the bankruptcy proceeding are not deemed admitted in the subsequent District Court case.  This interpretation is not supported by Local Rule 200.1, which provides that the case is transferred to the District Court where original jurisdiction lies.  The instant case is a continuation of the bankruptcy proceeding and the admissions are conclusively established for the purposes of this litigation.

argument in its Supplemental Recommendation Concerning Withdrawal of Reference in favor of a recommendation for withdrawal of reference. This argument, too, in unpersuasive. In the response brief, as in the instant Motion for Summary Judgment, the Government asserted that the Requests for Admission had been deemed admitted because of the Greenes' failure to file timely responses, thus conclusively establishing the facts therein for this litigation and the Government's substantive legal arguments. The Bankruptcy Court's Supplemental Recommendation holds only that nothing in the Government's response brief had changed its initial determination that the Bankruptcy Court does not have subject matter jurisdiction over Count III of the Greenes' Complaint and that the order of reference to bankruptcy should be withdrawn. Contrary to the Greenes' assertion, the Bankruptcy Court does not address the Government's argument that the Admissions were deemed admitted; in fact, a fair reading of the Bankruptcy Court's Order is that the court accepted the Government's position that those facts were deemed admitted but nonetheless held that the court did not have subject matter jurisdiction over Count III of the Complaint and that the order of reference should be withdrawn as to the entire Complaint.

In this instance, the Greenes' answers to the Requests for Admissions were served past the deadline. Although the Court is aware that *pro se* litigants face unique challenges, it is generally recognized that procedural rules must be complied with in order to promote an interest in the uniform administration of justice. *See Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001). Furthermore, to ensure fairness, "rules apply to uncounseled litigants and must be enforced." *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998). Because the Greenes did not answer the Requests for Admission within the time period specified, the matters therein are deemed admitted and are "conclusively established" for purposes of this litigation Fed. R. Civ. P. 36(b). While the

failure to respond to a request for admission may deprive a party of the opportunity to contest the merits of the case, the result is the orderly disposition of the case. *Kasuboski*, 834 F.2d at 1350. Notably, the Greenes were informed by the Government of this result should they fail to timely respond to the Requests for Admission. Under Rule 36, default admissions may serve as the factual foundation for summary judgment. *Id.* at 1350; *see also McCann v. Mangialardi*, 337 F.3d 782, 788 (7th Cir. 2003). Summary judgment is properly granted against the party who makes no response to a request to admit as to undisputed material facts supporting such a judgment. *Kasuboski*, 834 F.2d at 1350. However, the Court must determine whether summary judgment is appropriate under all the disputed material facts. Fed. R. Civ. P. 56. Therefore, the Court now takes the admitted facts as true for purposes of summary judgment and turns to the legal arguments before the Court.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate– in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no

reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe. Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc*., 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1526 (7th Cir. 1990).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of the witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 447 U.S. at 249-50; *Doe*, 42 F.3d at 443.

## MATERIAL FACTS

On March 31, 1988, Frederick Greene executed a promissory note for a Federal Family Education Loan Program Consolidation Loan in the amount of $34,347.00, to pay in full the student loans he received for attendance at Kentucky State University in 1981 and 1983-84, Andrews University in 1982, the University of Kentucky in 1984-85, and the University of Notre Dame in 1986-87. This loan was declared in default, and on October 28, 1993, the Nebraska Student Loan Program guaranty agency paid an insurance claim in the amount of $49,038.65 to the holder of the loan, whereby the Nebraska Student Loan Program took assignment of the loan, and whereby the loan was later assigned to the Department of Education on December 6, 1993.

On each of December 16, 2004, January 19, 2005, February 15, 2005, April 15, 2005, and May 18, 2005, Frederick Greene made a payment of $50.00 as repayment on his loan. As of March 12, 2006, Frederick Greene had made total payments of $300.00 to the United States Department of Education in repayment of his student loans. He has made no other payments on his student loans. When sent letters on December 9, 1993, and January 8, 1994, explaining the Department of

Education's willingness to negotiate repayment arrangements, Frederick Greene did not accept any of the Department of Education offers. Frederick Greene has not attempted to use any of the various options available to repay defaulted student loans such as deferment, forebearance, cancellation, and extended, graduated income-contingent, and income sensitive repayment options. As of January 11, 2006, Frederick Greene owed $102,541.19, including $49,038.65 in principal and $53,502.54 in interest, to the United States Department of Education on the student loans he received from 1981-1988. Frederick Greene is not permanently disabled.

On August 1, 1995, Terri Greene executed a promissory note from the William D. Ford Federal Direct Loan Program to attend Andrews University located in Berrien Springs, Michigan, in the amount of $2,600.00, including $1,750.00 in subsidized funds and $850.00 in unsubsidized funds. On September 22, 1995, Terri Greene executed a promissory note from the William D. Ford Federal Direct Loan Program to attend Andrews University in the amount of $6,999.00, including $3,666.00 in subsidized funds and $3,333.00 in unsubsidized funds. On April 1, 1996, Terri Greene executed a promissory note from the William D. Ford Federal Direct Loan Program to attend Andrews University in the amount of $3,499.00, including $1,833.00 in subsidized funds and $1,666.00 in unsubsidized funds. On October 3, 2001, Terri Greene executed a promissory note for a Direct Consolidation Loan from the William D. Ford Federal Direct Loan Program in the amount of $40,015.24, including $29,329.42 in subsidized funds, and $10,685.82 in unsubsidized funds. As of March 12, 2006, Terri Greene had not made any payments on the student loan debt which is the subject of this suit. When sent letters, on or around October 4, 2001, and November 24, 2001, explaining the Department of Education's willingness to negotiate repayment arrangements, Terri Greene made no effort to accept any of the offers. Other than asking for forebearance, Terri Greene

13

has not attempted to use any of the various options available to repay defaulted student loans such as deferment, cancellation, and extended, graduated income-contingent, and income sensitive repayment options.  As of January 12, 2006, Terri Greene owed $70,731.75, including $58,141.73 in principal and $12,590.02 in interest to the United States Department of Education on the student loans she received from 1995-2001.  Terri Greene is not permanently disabled.

Through the unanswered Requests for Admissions, the Greenes have admitted that they can afford to make payments of a reasonable amount until the debts are paid in full and that excepting the Notes from discharge under 11 U.S.C. § 523(a)(8) will not impose an undue hardship on them.

The Greenes reside in Tippecanoe County, Indiana, and have four children.  According to Schedule I filed by the Greenes in their bankruptcy, Frederick Greene was earning a gross monthly income of $3,370.00 which equals $40,440.00 annually and he was an assistant professor at St. Joseph's College.  The same Schedule I shows that Terri Greene was earning gross monthly income of $250.00 which equals $3,000.00 annually as a sales associate at L.S. Ayres.  According to Schedule A filed by the Greenes in their bankruptcy, the Greenes did not own any real estate. According to Schedule B filed by the Greenes in their bankruptcy, the Greenes owned two cars, a 1988 Cadillac Seville and 1999 Ford Windstar.  According to Schedule D filed by the Greenes in their bankruptcy, the Greenes owed Dayair Credit Union for the 1999 Ford Windstar. According to Schedule B, Question 11, the Greenes own a Defined Retirement Plan through TIAA-CREF and St. Joseph's College in the amount of $13,000.00.

In his deposition of June 12, 2007, Frederick Greene stated that his income is "in the neighborhood of $44,000.00, seven, eight, $900.00, in that range."  Docket Entry 53, Dep. of Frederick Greene, p. 9.  Beginning with the 2007-2008 school year, Frederick Greene had been

14

promoted to associate professor at St. Joseph's College.  Frederick Greene's salary from St. Joseph's College increases by one to three percent annually.

In her deposition of June 12, 2007, Terri Greene stated that her income is approximately $26,000.00 annually.  In 2007, Terri Greene was employed as a School Case Manager at Wabash Valley Hospital.

The Greenes have now purchased their residence pursuant to a contract, and they no longer owe a debt on the 1999 Ford Windstar.  Ten percent of Frederick Greene's salary is contributed to his TIAA-CREF retirement account.

The Greenes listed unsecured debt of $61,061.00 on Schedule F of their bankruptcy schedules.  The Greenes received a discharge under 11 U.S.C. § 727 from the United States Bankruptcy Court on November 7, 2005.  According to the docket of the Greenes' bankruptcy, no creditors opposed the Greenes' discharge, nor were any debts other than the student loans at issue sought to be excepted from discharge.

According to Schedule J of the Greenes' bankruptcy schedules, the Greenes made charitable contributions of $300.00 each month.  These charitable contributions were tithes to the Greenes' church, which were not a church requirement for membership.

In his deposition, Frederick Greene states he did not file a tort claim with the Department of Education on Standard Form 95.  He does leave open the possibility that he filed a document that was similar or "the purposes that this form is intended to serve may not have been met by some other notice or filing."   Docket Entry 53, Dep. of Frederick Greene, p. 37-38.  No such filing has been identified.  According to the Department of Education, neither Frederick Greene nor Terri Greene has filed a Notice of Federal Tort Claim with the Department of Education.

According to Schedule J of the Greenes' bankruptcy schedules, the Greenes have an expense of $50.00 each month budgeted for payment of Frederick Greene's student loans to the Department of Education

Frederick Greene is 46 years old, and Terri Greene is 43 years old.  Frederick Greene has a license to practice law from the State of Michigan and is in good standing.  Frederick Greene is continuing to pursue a Masters Degree in Criminal Justice.

Frederick Greene earns additional income as a cellular phone salesperson at Sam's Club in Lafayette, Indiana, earning up to $600 each month.

Frederick Greene, Terri Greene, and their children are covered by health insurance.

On Schedule J of the Greenes' bankruptcy schedules, the Greenes listed an expense of $50.00 for miscellaneous expenses.  On Schedule I, the Greenes list total monthly net income of $2,770.03, and on Schedule J, the Greenes list monthly expenses of $3,920.65.

Both Terri Greene and Frederick Greene submitted Affidavits in support of summary judgment,[5] and Frederick Greene further submitted the Affidavit of his maternal uncle Eugene Gully.

---

[5] In its Reply Brief, the Government raises evidentiary objections to numerous paragraphs of the Greenes' Affidavits. Federal Rule of Civil Procedure 56(e) provides, in relevant part, that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e). An affidavit that is not in compliance with Rule 56(e) can neither lend support to, nor defeat, a motion for summary judgment. *Heltzel v. Dutchmen Mfg., Inc.*, 3:06-CV-227-WCL, 2007 WL 4556735, at * 3 (N.D. Ind. Dec. 7, 2007) (citing cases). The following statements are not properly included in an affidavit and should be disregarded: (1) conclusory allegations lacking supporting evidence; (2) legal argument; (3) self-serving statements without factual support in the record; inferences or opinions not "grounded in observation or other first-hand experience;" and (5) mere speculation or conjecture. *Heltzel*, 2007 WL 4556735 at *4 (citing cases). In this matter, the Court declines to rule specifically on the objections raised in the Reply Brief, taking the Affidavits as they are presented. Although certain paragraphs of the Affidavits may be objectionable, the Affidavits still do not raise a genuine issue of material fact as to whether the Greenes have standing to bring their slave reparations claim as discussed fully in Part D.1 below.

In her Affidavit submitted in support of summary judgment, Terri Greene makes the following

factual statements:[6]

> 1.  I am a Plaintiff in this case, and if called to testify I would testify as to the contents of this affidavit, made upon my personal knowledge and belief.
>
> 2.  I was born in Lexington, Kentucky in 1964.
>
> 3.  I am the descendent of slaves from the Richmond, Kentucky area, and if called to testify I can demonstrate my families [sic] and I [sic] historical and direct ties to slavery.
>
> 4.  I attended schools in Lexington Kentucky until my graduation from high School in 1982.
>
> 5.  I attended Booker T. Washington Elementary School, a segregated elementary school in Lexington, Kentucky.
>
> 6.  In 1982, I began my college level education at Kentucky State University (KSU) in Frankfort, Kentucky.
>
> 7.  Kentucky Sate[sic] University is a Historically Black College or University (HBCU) founded in 1886.
>
> 8.  Kentucky State University is a land grant institution, having received its land from the federal government.
>
> 9.  KSU was founded to educate the freed slaves and the descendants of slavery.
>
> 10.  At the time of my attendance at KSU, and to this day, KSU is engaged in the education of African American students, descendants of slaves.
>
> 11.  Throughout the time I attended KSU, KSU was under-funded, and did not receive funding levels comparable to similarly situated Traditionally White Colleges (TWI's).
>
> 12.  In 1983, while I was a student at KSU, the Kentucky General Assembly acknowledged that there had been vast discrepancies in the funding levels, and that KSU had been under-funded comparable to TWI's.
>
> 13. The United States and/or the Department of Education, and/or its predecessors continues to accredit and certify KSU as an institution of higher learning.
>
> 14.  The US Government makes funds available to KSU through grants, funding, student loans, and various federal programs.
>
> 15.  While attending KSU I received my first federally backed student loan.
>
> 16.  For various reasons, particularly related to the segregated character of the school, lack of funding,[sic] I was unable to finish my degree at Kentucky State University.
>
> 17.  My later student loans at Andrews University were accumulated as a result of my need to obtain a college degree, that I was unable to obtain at the federally funded, federally accredited, Historically Black College or University, Kentucky State University.

---

[6] Paragraphs 22-26 of Terri Greene's Affidavit set forth legal arguments that are not restated here.

18.  If called to testify I will more particularly testify about the factual issues concerning the reduced value of the education I received at KSU as well as the extra loans I was forced to receive as a result of this federally backed scheme of "separate but unequal."

19.  I have personally suffered a concrete and particularized injury as a result of the US Department of Education's blessing, funding, support, accreditation and facilitation of this "separate but unequal" scheme of higher education.

20.  I have a personal stake in this litigation in that the Department of Education's acts and failures have directly affected the high amount of student loans I now owe.

21. I am not seeking a judgment against the Department of Education, but am simply seeking to assert my affirmative rights relative to their claim that I owe them unpaid student loans and an adjudication from the courts as to what amount I may owe, if any, considering their claim, my defenses, and offsets.

. . . .

27.  I am presently unable to pay any amount for student loans because of high expenses regarding the special education needs of my four children.

28.  I struggle every payday to simply stay afloat and maintain a minimal standard of living now, without the added expense of these unfair student loan amounts.

29.  I object to the usurious interest rates charged by the Department of Education in that the Department charges interest rates way above even commercially available loans.

30.  If called to testify, I will more particularly address all of these facts and circumstances.

Pl. Br., Aff. of Terri Greene.

The Affidavit of Frederick Greene at paragraphs 1, 4-12, 19-22, 28-30, and 40 restates

paragraphs 1, 7-15, 18-21, 27-30 of Terri Greene's Affidavit.[7]  The remainder of Frederick Greene's

Affidavit provides:

2.  I am the descendant of slaves from the North Carolina and Mississipp[sic], and if called to testify I can demonstrate my families[sic] and My historical and direct ties to slavery.

3.  In 1981 I attended college at Kentucky State University (KSU) in Frankfort Kentucky, where I graduated in 1984.

. . . .

13.  After graduation I was "steered" to law school at the University of Kentucky (UK).

---

[7] Paragraphs 23-27 of Frederick Greene's Affidavit set forth legal arguments that are not restated here.

14.  I was steered to UK because Kentucky schools were operating under a desegregation decree by the state legislature to accept more minorities at UK and more whites at KSU.

15.  Resulting from this effort to integrate Kentucky Higher Education, I did not apply, nor was I advised or aware that my LSAT scores and undergraduate GPA were sufficient to apply at Ivy League schools and top 20 law schools.

16. I did not discover how high my LSAT scores were until 1998 while working at the University of Mississippi Law School, sitting on an admissions committee.

17.  At that time, fourteen years after graduation from college and 11 years after graduation from law school, I discovered that I had been "used" by KSU and UK to help resolve their problem of segregation without regard to my personal capabilities and qualifications.

18.  My student loan balances and ability to pay have been adversely impacted by these historical wrongs.

. . . .

31.  The Department of Education has alleged that by virtue of my law license I can earn substantially more than the $40,000+ I now earn as a college professor.

32.  From 1988 until 1997 I was engaged in the private practice of Law in Lansing, Michigan. I did not net in any of those years income in excess of my present earnings.

33.  In each and every year while practicing law, and in each and every year since, I have attempted to find higher paying employment to no avail.

34.  Law firms and corporations will not hire me because I am an older African American male.

35.  Less than three percent of all lawyers in America are African American.

36.  The legal profession has been called the last "bastion of segregation" because of the minimal number of black lawyers hired by silk stocking law firms.

37.  I have inquired with the US Department of Justice about positions there where less than 1% of department lawyers are African Americans.

38.  I have been forced to maintain second jobs in areas far below my qualifications because of my inability to obtain higher paying employment.

39.  I am absolutely unable to afford student loan payments in that I can barely stay afloat with my present obligations.

Pl. Br., Aff. of Frederick Greene.

Finally, the Affidavit of Eugene Gully provides, in relevant part:

4.  I am the maternal Uncle of the Plaintiff, Frederick V. Greene.

5.  I am the older full brother of his mother Estella Greene.

6.  I was born in 06/27/1922 in East Saint Louis, Illinois.

7.  In 1927 My family, including the Plaintiff's mother moved back to our home in Mississippi.

8.  My father was James Gully, the grandfather of the Plaintiff.

9.   James Gully's father and mother were Henry and Rachel Gully, both grandchildren of slaves.

10.  In 1931 my father and family were run out of Mississippi because of racism by the Ku Klux Klan or a similar group, and the family fled north to Chicago in fear of their lives.

11.  Because of the discrimination and racism, the family was forced to leave Mississippi without even selling the family property which was close to 100 acres of land near Meridian, Mississippi.

12.  This land was lost because the family could not find protection from the federal or state government to protect them in going back to Mississippi.

13.  Our ancestral land is now worth substantial sums of money, that would have been passed down from generation to generation but for our ability to obtain protection from the federal government in protecting our civil rights.

14.  I am certain that some of the money from either the sale or continued farming or development of that land would have accrued to the benefit of my nephew the Plaintiff.

Pl. Br., Aff. of Eugene Gully.

## ANALYSIS

In their Complaint, the Greenes seek a determination by the Court that their student loans are dischargeable in bankruptcy on several grounds.  The Greenes argue that under 11 U.S.C. § 523(a)(8), their loans pose an undue hardship, and the allegation of undue hardship appears throughout the Complaint.  The Greenes also argue that the statute of limitations has expired as to the collection of the loans, that the Government negligently charged the Greenes excessive interest and penalties, and that the loans should be discharged in bankruptcy as reparations for slavery and discrimination.

## A.  Statute of Limitations - Count I

Count I, paragraph 11 of the Greenes' Complaint alleges that the collection of their student loans is barred by the applicable statute of limitations.  Pursuant to 20 U.S.C. § 1091a, there is no limitations period for the collection of student loans, and the Greenes concede this point in their response brief.  Accordingly, the Court recommends that the Motion for Summary Judgment be granted as to Count I.

## B.  Negligence Claim - Count II

In Count II, paragraph 13 of their Complaint, the Greenes allege that their student loans should be discharged because the Government's negligence caused the assessment of excessive interest and penalties.  The Government moves for summary judgment on the Greenes' negligence claim on the basis that, because the Greenes did not comply with the Federal Tort Claims Act, the Court is deprived of subject matter jurisdiction over any claim based on negligence.

An allegation of negligence constitutes a tort action.  "[T]he United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."  *United States v. Sherwood*, 312 U.S. 584, 586 (1941); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983).  Under the Federal Tort Claims Act ("FTCA"), the United States has waived its sovereign immunity and given its consent to be sued for tort actions.  *See* 28 U.S.C. § 1346(b).[8]  A prerequisite to filing a tort action for money damages

_____

[8] The United States has consented to be sued in actions sounding in tort for money damages:
Subject to the provisions of chapter 171 of this title, the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be

21

against the United States in federal court is that the plaintiff must "have first presented the claim to the appropriate Federal agency."  28 U.S.C. § 2675(a).

In this case, there is no allegation in the Complaint that the Greenes filed a federal tort claim. The Government has submitted an Affidavit from the Department of Education providing that neither of the Greenes filed a tort claim with the Department.  In addition, both of the Greenes testified at their depositions that they did not file a tort claim with the Department of Education. Because the Greenes have not complied with the FTCA in this case, the United States' sovereign immunity is not waived, and the Court lacks jurisdiction over the Greenes' negligence claim. Accordingly, the Court recommends that summary judgment be granted on the claim of negligence in Count II of the Greenes' Complaint.

### C.  Affirmative Defenses

At various times in their response brief, the Greenes argue that, although they initially brought this suit as plaintiffs, they are in essence the defendants in this matter; therefore, they argue that Counts II and III in the Complaint are in reality affirmative defenses to the Government's claim that the Greenes owe them student loan money.  Federal Rule of Civil Procedure 8(c), which governs affirmative defenses, provides that affirmative defenses may be raised  "in responding to a pleading." Fed. R. Civ. P. 8(c).  As the Greenes acknowledge in their brief, the Government has not brought suit against the Greenes.  The Greenes' Complaint in this matter was the initial filing and is not in response to any other pleading in this case.  Therefore, the Court recommends that the District Court decline to construe the allegations of the Greenes' Complaint as affirmative defenses.

---

liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1).

### D.  Slave Reparations - Count III

In Count III, paragraph 16 of their Complaint, the Greenes allege that their loans constitute an undue hardship and that the loans, including principal, interest, and penalties, should be discharged "by virtue of reparations for slavery and discrimination due and owing" to them.  Pl. Cmplt., ¶ 16.  The Government seeks dismissal of this claim on the basis that the Court lacks jurisdiction to hear the slavery reparations and discrimination claim, arguing that the Greenes lack standing, the statute of limitations has expired, and the Court should decline to hear this case under the political question doctrine.  In addition, the Government argues that, to the extent the Greenes seek damages for the slave reparations as an offset against the student loans, such an action would be governed by the FTCA, and, as noted above, the Greenes have not filed any claim with the Government as a precondition to suit.

In their Response Brief, the Greenes argue that the issue of slave reparations is within the jurisdiction of the Court by generally asserting "the relevant parts of their affidavits" and restating paragraphs 1-20 of Terri Greene's Affidavit.  Pl. Br., p. 6.  The Greenes also argue that the Court has the authority to "review actions by the Department of Education that may have violated individual civil rights."  *Id.*, p. 7.

In an expansive decision considering claims for slave reparations, Judge Norgle of the United States District Court for the Northern District of Illinois provided, in addition to historical background on slavery, a survey of the various aspects of the movement for slave reparations and the following general definition of slave "reparations" that emerges therefrom:

> "[R]eparations mean truth commissions that document the history of racial crimes and the current liability for those crimes, apologies that acknowledge liability, and

23

payments to settle the account." These payments may be made in the form of a trust, with the descendants of slaves named as trust beneficiaries, or other forms of subsidies given to the descendants, and could be made by private entities who have allegedly profited from slavery (as the plaintiffs in the instant suit urge). The reparations movement more commonly insists, however, that the United States government should make these payments. Reparations are justified, advocates argue, on several grounds, including that of an alleged moral and legal debt owed to descendants of slaves, and the historical precedents of reparations for the victims of other historical injustices. However, there are a number of cogent arguments against reparations, including the arguments that present day Americans are not morally or legally liable for historical injustices, that the debt to African-Americans has already been paid, and that reparations talk is divisive, immersing African-Americans in a culture of victimhood.

*In re African-American Slave Descendants Litigation*, 375 F. Supp. 2d 721, 734 (N.D. Ill. 2005) (citation omitted). In that case, the plaintiffs alleged that they were descendants of slaves and sought reparations from private corporations alleged to have unjustly profited from the institution of slavery. The District Court dismissed the plaintiffs' second amended complaint, holding that the plaintiffs did not have standing under Article III of the Constitution, the plaintiffs did not have thirty-party standing to assert the legal rights of their ancestors, the plaintiffs were impermissibly attempting to litigate a generalized grievance, the political question doctrine barred the court from entertaining the case as the issues raised in the complaint were more properly addressed by Congress and state legislatures, the plaintiffs failed to state a claim upon which relief can be granted, and the plaintiffs' claims were time-barred by operation of various statutes of limitations. *Id*. at 721.

On appeal, the United States Court of Appeals for the Seventh Circuit affirmed the District Court's ruling on the basis of lack of standing, with a few exceptions. *In re African-American Slave Descendants Litigation*, 471 F.3d 754, 759 (7th Cir. 2006). The Seventh Circuit found that those plaintiffs suing as representatives of slaves rather than as descendants of slaves had standing but nevertheless affirmed the dismissal of those claims on the merits because the statute of limitations

24

had expired. *Id.* at 762, 763.  However, the court reversed the dismissal of the consumer protection claims, which alleged that certain plaintiffs had purchased products or services from the defendants that they would not have bought had the defendants not concealed their involvement in slavery, because the claim had nothing to do with the "ancient violations" of slavery. *Id.* at 763.

The Court now turns to the various arguments raised by the Government in support of its Motion for Summary Judgment on the Greenes' claim that their student loan debt should be discharged as slave reparations.

*1. Standing*

In this case, the Government argues that the Greenes do not have standing to assert reparations for slavery and discrimination as a basis for the discharge of their student loans. Pursuant to Article III of the United States Constitution, federal courts have jurisdiction only if presented with a "case" or "controversy."  The justiciability doctrines, including that of standing, ensure that the federal court has the authority to hear the matters before it. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). "The doctrine of standing ensures that a litigant is the proper party to bring a matter before a federal court for adjudication, by asking if that specific litigant has a sufficient stake in the matter to invoke the federal judicial process." *Slave Descendants*, 375 F. Supp. 2d at 744.  The Supreme Court continues to stress "that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

"The irreducible constitutional minimum of standing contains three requirements." *Bensman v. United States Forest Service*, 408 F.3d 945, 949 (2005) (quoting *Steel Co.*, 523 U.S. at 102).  In this case, the Greenes must have suffered an "'injury in fact'-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).  Second, there must be a causal connection between the Greenes' injury and "the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (citations and internal quotation marks omitted).  Finally, "it must be likely, as opposed to merely speculative," that the Greene's injury "will be redressed by a favorable decision. *Id.* at 561 (citations and internal quotation marks omitted).  "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement." *Steel Co.*, 523 U.S. at 103.  On this motion for summary judgment, the Greenes bear the burden of demonstrating that they have standing to maintain this action with competent proof. *Perry v. Village of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999); *see also Steel Co.*, 523 U.S. at 104; *Lujan*, 504 U.S. at 561.

As to the first requirement for standing, "[i]t is well-established that a plaintiff must 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Slave Descendants*, 375 F. Supp. 2d at 748 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982)).  The Seventh Circuit affirmed, holding that "the wrong to the ancestor is not a wrong to the descendants." *Slave Descendants*, 471 F.3d at 75.  As with the plaintiffs in *Slave Descendants*,

many of whom were the alleged direct descendants of slaves, the Greenes in this case "face insurmountable problems in establishing 'to a virtual certainty' that they have suffered concrete, individualized harms at the hands of the" Government.  375 F. Supp. 2d at 747.

Both of the Greenes state in their Affidavits that they are the descendants of slaves and that they can demonstrate their families' historical and direct ties to slavery.[9]  The remainder of Terri Greene's statements in her Affidavit, whether or not admissible at trial, assert the general adverse effects of segregation on her elementary and college-level education.  She states in the Affidavit that the first university she attended, Kentucky State University ("KSU"), a Historically Black College or University, was a land grant institution founded to educate the freed slaves and the descendants of slavery and that KSU was underfunded and did not receive funding levels comparable to similarly situated Traditionally White Colleges.  She also states that "[f]or various reasons, particularly related to the segregated character of the school, lack of funding, I was unable to finish my degree" at KSU, and that she accumulated further loans at Andrews University in Michigan as a result of not being able to complete her education at KSU.

Both Greenes state that they received their first federally-backed loans at KSU.  Frederick Greene also asserts the same facts about KSU's history and funding.  Frederick Greene further states that he was "steered" to law school at the University of Kentucky because of a desegregation decree. He states that he was "used" to fulfill desegregation requirements rather than being counseled that his test scores and undergraduate grades were sufficient to apply to Ivy League and top twenty law schools.  As a result, he concludes that his student loan balances and ability to pay have been

---

[9] As noted earlier in footnote 5, the Government objections to many paragraphs in both Affidavits. However, the Court declines to rule on the objections, but rather takes the Affidavits as they are submitted, finding that they do not raise a genuine issue of material fact.

adversely impacted by these historical wrongs.[10]  Frederick Greene has also submitted an Affidavit from his uncle, Eugene Gully, who states that Frederick Greene is the great-great-great grandchild of slaves.[11]  He also states that Frederick Greene's paternal grandfather and his family fled Mississippi to Chicago in 1931 because of racism by the Ku Klux Klan or a similar group, which resulted in them leaving behind and effectively forfeiting significant family real property that is now worth substantial sums of money.  Mr. Gully states that he is certain that some of the money from either the sale or continued farming or development of that land would have accrued to the benefit of Frederick Greene.

Here, Terri Greene's ability to show that she is descendant from slaves and Frederick Greene's ability to show that he is descendant from slaves and that his family suffered from discrimination in the period following the abolition of slavery and any claim of lost economic wealth of their ancestors is too "speculative an inquiry to provide a basis for a federal suit."  *Slave Descendants*, 471 F.3d at 761.  "While most would like to assume that they will be the beneficiaries of their ancestors' wealth upon their demise, this is a mere assumption. [The Greenes] can only speculate that their ancestors' estates would have been passed on to them, and cannot say that they would have inherited their ancestors' lost pay [or property].  This is insufficient to show a personal injury to [the Greenes]."  *Slave Descendants*, 375 F. Supp. 2d 721.  Therefore, the Greenes cannot assert standing for their claim that they are financially disadvantaged and, thus, cannot repay their student loans based solely on the fact of being the descendants of slaves.

---

[10] In his deposition, Frederick Greene states that he received his juris doctor degree from Notre Dame School of Law.

[11] Eugene Gully states that the Frederick Greene's grandfather, James Gully, was the son of Henry and Rachel Gully, both of whom were the grandchildren of slaves.

28

The Greenes' statements in their Affidavits regarding the funding of Kentucky State University and the quality of education are arguments about ongoing discrimination against African Americans and are a "generalized, class-based grievance." *See Cato v. United States*, 70 F.3d 1103 (9th Cir. 1995) (holding that alleged injuries based on "disparities in employment, income, and education" between African-Americans and other racial groups were insufficient to establish a personal injury to the plaintiffs); *see also Slave Descendants*, 375 F. Supp. 2d at 749 (citing cases). The Greenes' allegations of educational discrimination leading to the inability to repay their loans do not establish a concrete and particularized injury-in-fact, as these allegations are too speculative and generalized.

Finally, Frederick Greene's injury that he was "steered" to attend the University of Kentucky Law School and thus did not know that he had the test scores and grades to be competitive at top law schools is also an allegation of generalized, class-based discrimination as to Defendant United States Department of Education in this case.  The instant cause of action was not brought against KSU, UK, a specific academic advisor, or any one else who may have "steered" Frederick Greene to attend law school at UK.  Rather, this case was brought against the Government, and, thus, any connection to the alleged modern-day injury would again be through the historical interplay between slavery and what Greene argues is the resulting discrimination still prevalent in the United States when he was applying to law school.  The causal connection between his injury–being steered to a certain law school and not advised of other potentially more advantageous opportunities–and the conduct complained of–slavery and endemic discrimination is too far removed to be fairly traceable to the United States.

29

Therefore, the Greenes have not met their burden of establishing that they have standing under the constitution to litigate their claim that their loans should be discharged as a form of slave reparations for their injuries alleged to be the result of slavery and resulting discrimination.[12] Because a lack of standing is dispositive of the Greenes' claims for slave reparations, the Court recommends that summary judgment be granted in favor of the Government on Count III of the Complaint. Nevertheless, the Court considers the other bases presented by the Government as grounds for granting summary judgment on Count III.

*2. Statute of Limitations*

The Government argues that there is no statute of limitations that would give the Court the power to hear the Greenes' claim that their student loans should be discharged as reparations for slavery. In *Slave Descendants*, the Seventh Circuit dismissed the claims of class members who brought suit as representatives of the estates of their ancestors as barred by the statute of limitations, explaining that "suits complaining about injuries that occurred more than a century and a half ago have been barred for a long time by the applicable state statutes of limitations." 471 F.3d at 762. The court further held that not even tolling doctrines (although none are asserted by the Greenes in

---

[12] Although not raised by the Government, in addition to the constitutional limitations on standing, a court may also consider prudential limitations standing. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) (explaining that the standing doctrine involves both constitutional limitations on federal courts based on Article III as well as prudential limitations on the exercise of federal court jurisdiction). Two of the prudential limits on standing are that a litigant must assert his own legal interests rather than those of third parties, *id*. at 499, and that the federal courts should "refrain[] from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches, *Valley Forge*, 454 U.S. at 475 (citing *Warth*, 422 U.S. at 499-500). In this case, the Greenes may not assert the legal rights of their ancestors because they themselves have not established that they can satisfy the Article III case-or-controversy requirement. *See Slave Descendants*, 375 F. Supp. 2d at 755 (citing *Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976)). As discussed in the context of the constitutional limits on standing above and of the political question doctrine, the issue of slave reparations sought to be litigated by the Greenes is an "abstract question of wide public significance" that is best left to the executive or legislative branches of government. *See Valley Forge*, 454 U.S. at 475.

this case) can extend a statute of limitations to over a century. *Id.* Similarly, even if the Greenes had standing to bring this claim, which they do not, the statue of limitations for any injury arising out of the wrongs inflicted by slavery has long since expired.

To the extent that Frederick Greene asserts in his Affidavit some kind of misrepresentation in the course of his law school application process as a result of desegregation, again the Court notes that the individuals or institutions involved in that process are not parties to this suit and any claim against the Government on the basis of this misrepresentation can only be linked through the historical ties to slavery for which the statute of limitations has expired. Moreover, as discussed below in Part D.3, any claim for this alleged present-day misrepresentation that may be linked to the Government sounds in tort, and the Greens have not complied with the FTCA.

Accordingly, the Court recommends that the Government be granted summary judgment on the Greenes' claim for slave reparations in Count III of the Complaint on the additional basis that the statute of limitations for such a claim has passed.

*3. Sovereign Immunity and Federal Tort Claims Act*

The Government argues that, to the extent the Greenes are seeking money damages for slavery and discrimination from the Government in Count III, such an action sounds in tort, and the Court's jurisdiction to hear such a suit is governed by the Federal Tort Claims Act ("FTCA"). As discussed above in Part B, the United States may not be sued absent its consent, which is a prerequisite to jurisdiction. *See Mitchell*, 463 U.S. at 212 (1983). The United States has waived its sovereign immunity and given its consent to be sued for tort actions under the FTCA, *see* 28 U.S.C. § 1346(b), which requires that a tort claim be filed with the government as a precondition of any

suit, *see* 28 U.S.C. § 2675(a).  As discussed, the Greenes have not filed a claim under the FTCA; therefore, the Court does not have jurisdiction to hear any claim against the United States for damages as a result of slavery and discrimination as such claims fall outside of the United States' waiver of its sovereign immunity.  The Greenes have not asserted any other basis for a waiver of the Government's sovereign immunity.

Therefore, the Court recommends that the District Court grant summary judgment on the Greenes' slave reparations claim in Count III as the Court does not have jurisdiction to hear this claim because the Government has not waived its sovereign immunity.  *See, e.g.*, *Long v. United States*, 1:06-CV-P176-M, 2007 WL 2725973, at *6-7 (W.D. Ky. Sept. 14, 2007) (holding that the complaint was barred by the doctrine of sovereign immunity); *Abdullah v. United States*, 3:02-CV-1030, 2003 WL 1741922, at * 1-2 (D. Conn. Mar. 25, 2003) (same); *Hayes v. Deputy Comm'rs of Bureau of Indian Affairs*, 1:03-CV-498, 2003 WL 23508096, at *1 (D. Md. Mar. 3, 2003) (same); *Bell v. United States*, 301-CV-0338-D, 2001 WL 1041792, at * 2 (N.D. Tex. Aug. 31, 2001) (same); *Himiya v. United States*, No. 94 C 4065, 1994 WL 376850, at * 1 (N.D. Ill. July 15, 1994) (same).

*4.  Political Question Doctrine*

The Government argues that the Court should not hear the Greenes' claim for slave reparations under the political question doctrine.  The Greenes do not offer a response.

Like standing, the political question doctrine is a justiciability doctrine and is grounded in the constitutional principle of separation of powers in the text of the Constitution.  *See Baker v. Carr*, 369 U.S. 186, 210 (1962).  The political question doctrine "bars the federal courts from adjudicating disputes that the Constitution has been interpreted to entrust to other branches of the

federal government." *Slave Descendants*, 471 F.3d at 758; *see also McIntyre v. Fallahay*, 766 F.2d 1078, 1081 (7th Cir. 1985) (citing *Baker*, 369 U.S. at 217 (explaining that the political question doctrine is designed in part to prevent "the potentiality of embarrassment [that would result] from multifarious pronouncements by various departments on one question").  In *Baker*, the Supreme Court identified six factors associated with a matter that raises a political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.  Any one of these factors independent of the others is sufficient for a court to decline to hear a case brought before it on the basis of non-justiciability.  *See Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (citing *Baker*, 369 U.S. at 217).

The grant of summary judgment by the District Court in *Slave Descendants* was based, in part, on the political question doctrine, holding that the claims in the plaintiffs' complaint were better heard by the legislature. 375 F. Supp. at 766.  On appeal, the Seventh Circuit held that, given the legal nature of the remedy sought by the plaintiffs in that case, if the plaintiffs could overcome all of the other hurdles of standing, proving the harm, establishing that the law [§ 1982] was intended to provide a remedy to lawfully enslaved persons or their descendants, identifying their ancestors, quantifying damages incurred, and persuading the court to toll the statute of limitations, there would be a justiciable controversy.  *Slave Descendants*, 471 F.3d at 758-59.  Although not brought under § 1982, the Greenes' cause of action seeks the specific legal remedy of restitution

through the forgiveness of their loans as reparations for slavery, similar to the legal remedy sought

by the plaintiffs in *Slave Descendants*.  However, because this count should be dismissed on the

bases that the Greenes do not have standing to sue, the statute of limitations has expired, and the

United States has not waived its sovereign immunity, the Court need not resolve the applicability

of the political question doctrine to this case.


*5.  Allegation of Discrimination*

In Count III, the Greenes allege that their student loans should be discharged as a result of

slavery reparations and discrimination.  There are no allegations in the Complaint of discrimination

by the Department of Education.  However, in his deposition, Frederick Greene clarified that the

discrimination referenced in the Complaint has been an ongoing problem since the end of slavery,

with the discrimination a direct result of the effect of slavery.  In their Response Brief, the Greenes

argue that this Court has jurisdiction to review actions by the Department of Education "that may

have violated individual civil rights."  However, there are no allegations in the Complaint supporting

a civil rights violation by the Department of Education against the Greenes.  Nor did either of the

Greenes identify any specific instance of discrimination by the Department of Education in their

Affidavits.  The Court finds that the references to "discrimination" in the Complaint are intricately

related to the slavery claims, as indicated by Frederick Greene in his deposition, and are analyzed

simultaneously with the claims for slavery reparations.

*6. Conclusion*

The Greenes do not have standing to bring their slave reparations claim, the statute of limitations has expired for the claim, and the Greenes have not complied with the FTCA. Accordingly, the Court recommends that the District Court grant summary judgment in favor of the Government on Count III of the Complaint.

**E.  Undue Hardship**

Throughout their Complaint, the Greenes allege that the student loans, including interest and penalties, for which they are indebted to the United State Department of Education are an undue hardship on them individually and jointly.  The Government argues on summary judgment that the Greenes cannot establish that the failure to discharge their student loans creates an undue hardship.

Under § 523 of Title 11 of the United States Code, an educational loan may be discharged in bankruptcy if it imposes an undue hardship:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
> . . .
>> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit . . . unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor's dependents; . . . .

11 U.S.C. § 523(a)(8).  The test to prove that student loans impose an "undue hardship," which is not defined in the Bankruptcy Code, requires that the borrower show:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner v. New York Educational Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987); *see also Matter of Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993) (adopting the three-part *Brunner* test). To prevail and demonstrate undue hardship, the Greenes are required to satisfy all three parts of the test. *See Brunner*, 831 F.2d at 396. The burden of proof that their loans should be discharged rests with the Greenes. *Roberson*, 999 F.2d at 1137. However, the Court in *Roberson* held that the first part of the test–whether the debtor can maintain a minimal standard of living if forced to repay the loans– is the starting point for the § 523(a)(8) analysis and is a prerequisite to the court examining the other two requirements of the *Brunner* test. *Id.* at 1135.

Both Terri Greene and Frederick Greene received Requests for Admissions from the Government in this case asking if repayment of the student loans would pose an undue hardship and also if they could afford to make reasonable payments on the loans. Neither timely answered the Requests for Admissions, and the Court has held that the requests are now deemed admitted for purposes of this litigation. As set forth above in the ruling deeming the Requests for Admissions admitted, default admissions may serve as the factual foundation for summary judgment. *Kasuboski*, 834 F.2d at 1350. Accordingly, both Terri Greene and Frederick Greene have admitted and, therefore, it is conclusively established, that they can make reasonable payments on their loans and that the repayment of the student loans does not impose an undue hardship. Therefore, there is no genuine issue of material fact as to the first part of the *Brunner* test, and the Court recommends that summary judgment be granted in favor of the Government on the Greenes' claim that their student loan debt should be discharged as an undue hardship under 11 U.S.C. § 523(a)(8).

### E.  College Cost Reduction Act

On November 13, 2007, the Greenes filed a Motion to File an Additional Response, asking the Court to permit the filing of a supplemental response brief to the Motion for Summary Judgment in order to address the impact on this litigation, if any, of the College Cost Reduction and Access Act (the "Act"), which was signed into law on September 17, 2007.  The Court granted the request, setting a deadline of January 14, 2008, for the filing of a supplemental brief.  Rather than filing the brief, the Greenes filed a Request to Reopen Discovery in order to ascertain the legal impact of the Act on this case, which the Court denied.  Although the Greenes did not file an additional response brief addressing the impact of the Act on this litigation, the Court nevertheless briefly addresses the legal issues related to the Act mentioned by the Greenes in their Request to Reopen Discovery.

First, the Greenes note that the Act allows for the forgiveness of certain types of student loans, including Federal Direct Stafford Loans, Federal Direct Plus Loans, Federal Direct Unsubsidized Loans, and Federal Direct Consolidation Loans, for "public service employees." Second, the Greenes note that the Act allows for loan forgiveness for teaching as, among others, a full-time faculty member at a Tribal College or University and other faculty teaching in high-needs areas, as determined by the Secretary.  The Greenes question whether working at a private, non-profit college or a hospital qualify the Greenes.  Third, the Greenes sought to ascertain what impact the requirement of the Act that a borrower not be in default would have on their qualification for loan forgiveness under the statute.

Title IV of the Act, entitled "Loan Forgiveness for Public Services Employees," directs that the balance of any Federal Direct Loan not in default be cancelled for borrowers who, after October 1, 2007, have made 120 monthly payments under income-based or standard repayment plans while

employed in certain public service jobs.  *See* 20 U.S.C. § 1087e(m)(1).  For purposes of the federal

student loan program, the term "default" is defined as "only such defaults as have existed for (1) 270

days in the case of a loan which is repayable in monthly installments, or (2) 330 days in the case of

a loan which is repayable in less frequent installments."  20 U.S.C. § 1085(l).

Terri Greene has made no payments on her loan and Frederick Greene made a total of only

$300 in loan payments over a period of approximately five to six months.  The evidence of record

reflects that neither is currently subject to a repayment plan as both rejected the Government's offers

to restructure their loan payments.  The Greenes are also in default on their loans.  Therefore,

whether or not their professions qualify under the definition of "public service job" under 20 U.S.C.

§ 1087e(m)(3)(2) or whether their loans are "eligible Federal Direct Loans" under 20 U.S.C.§

1087e(m)(3)(1) are irrelevant.


**CONCLUSION**

After considering the briefs, the Court **RECOMMENDS** that the District Court **GRANT**

the Motion for Summary Judgment or Alternatively Partial Summary Judgment [DE 17].

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(B).

Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have ten (10) days after being served with a copy

of this Recommendation to file written objections thereto with the Clerk of Court.  The failure to file

a timely objection will result in the waiver of the right to challenge this Recommendation before

either the District Court or the Court of Appeals.  *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 904 (7th

Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor*

*Steel Corp.*, 882 F.2d 258, 260-261 (7th Cir. 1989); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

SO ORDERED this 7th day of February, 2008.

 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record