UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| FREDERICK VAUGHN GREENE and TERRI LYNN GREENE, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CIVIL NO. 4:06cv105 ) |
| U.S. DEPARTMENT OF EDUCATION, | ) ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court on an objection to report and recommendation, filed by the plaintiffs, Frederick Vaughn Greene and Terri Lynn Greene ("the Greenes"), pro se, on February 22, 2008. The government responded to the objection on March 3, 2008. The Greenes have declined to file a reply.

Discussion

On July 29, 2005, the Greenes filed a Chapter 7 bankruptcy petition before the United States Bankruptcy Court for the Northern District of Indiana, Hammond Division at Lafayette. The Greens were granted a discharge under 11 U.S.C. § 727 on November 7, 2005. During the pendency of the bankruptcy, the Greenes filed a Complaint against the United States Department of Education, asking the Bankruptcy Court to "discharge student loan debt, and/or interest and penalties pursuant to 11 U.S.C. 523, and other statutory and constitutional law". The Greenes filed a motion to withdraw reference from the Bankruptcy Court, which motion was granted on September 7, 2006.

On June 29, 2007, the Department of Education filed a motion for summary judgment, and on October 10, 2007 an order was entered referring this case to Magistrate Judge Paul

Cherry to submit to this court a Report and Recommendation for the disposition of this case. On February 7, 2008, Magistrate Judge Cherry submitted his Report and Recommendation, in which he recommended that this court grant the motion for summary judgment.

The material facts in this case, as recited in the Report and Recommendation, are as follows:

On March 31, 1988, Frederick Greene executed a promissory note for a Federal Family Education Loan Program Consolidation Loan in the amount of $34,347.00, to pay in full the student loans he received for attendance at Kentucky State University in 1981 and 1983-84, Andrews University in 1982, the University of Kentucky in 1984-85, and the University of Notre Dame in 1986-87. This loan was declared in default, and on October 28, 1993, the Nebraska Student Loan Program guaranty agency paid an insurance claim in the amount of $49,038.65 to the holder of the loan, whereby the Nebraska Student Loan Program took assignment of the loan, and whereby the loan was later assigned to the Department of Education on December 6, 1993.

On each of December 16, 2004, January 19, 2005, February 15, 2005, April 15, 2005, and May 18, 2005, Frederick Greene made a payment of $50.00 as repayment on his loan. As of March 12, 2006, Frederick Greene had made total payments of $300.00 to the United States Department of Education in repayment of his student loans. He has made no other payments on his student loans. When sent letters on December 9, 1993, and January 8, 1994, explaining the Department of Education's willingness to negotiate repayment arrangements, Frederick Greene did not accept any of the Department of Education offers. Frederick Greene has not attempted to use any of the various options available to repay defaulted student loans such as deferment,

2

forbearance, cancellation, and extended, graduated income-contingent, and income sensitive repayment options. As of January 11, 2006, Frederick Greene owed $102,541.19, including $49,038.65 in principal and $53,502.54 in interest, to the United States Department of Education on the student loans he received from 1981- 1988. Frederick Greene is not permanently disabled.

On August 1, 1995, Terri Greene executed a promissory note from the William D. Ford Federal Direct Loan Program to attend Andrews University located in Berrien Springs, Michigan, in the amount of $2,600.00, including $1,750.00 in subsidized funds and $850.00 in unsubsidized funds. On September 22, 1995, Terri Greene executed a promissory note from the William D. Ford Federal Direct Loan Program to attend Andrews University in the amount of $6,999.00, including $3,666.00 in subsidized funds and $3,333.00 in unsubsidized funds. On April 1, 1996, Terri Greene executed a promissory note from the William D. Ford Federal Direct Loan Program to attend Andrews University in the amount of $3,499.00, including $1,833.00 in subsidized funds and $1,666.00 in unsubsidized funds. On October 3, 2001, Terri Greene executed a promissory note for a Direct Consolidation Loan from the William D. Ford Federal Direct Loan Program in the amount of $40,015.24, including $29,329.42 in subsidized funds, and $10,685.82 in unsubsidized funds. As of March 12, 2006, Terri Greene had not made any payments on the student loan debt which is the subject of this suit. When sent letters, on or around October 4, 2001, and November 24, 2001, explaining the Department of Education's willingness to negotiate repayment arrangements, Terri Greene made no effort to accept any of the offers. Other than asking for forbearance, Terri Greene has not attempted to use any of the various options available to repay defaulted student loans such as deferment, cancellation, and

extended, graduated income-contingent, and income sensitive repayment options. As of January 12, 2006, Terri Greene owed $70,731.75, including $58,141.73 in principal and $12,590.02 in interest to the United States Department of Education on the student loans she received from 1995-2001. Terri Greene is not permanently disabled.

Through the unanswered Requests for Admissions, the Greenes have admitted that they can afford to make payments of a reasonable amount until the debts are paid in full and that excepting the Notes from discharge under 11 U.S.C. § 523(a)(8) will not impose an undue hardship on them.

The Greenes reside in Tippecanoe County, Indiana, and have four children. According to Schedule I filed by the Greenes in their bankruptcy, Frederick Greene was earning a gross monthly income of $3,370.00 which equals $40,440.00 annually and he was an assistant professor at St. Joseph's College. The same Schedule I shows that Terri Greene was earning gross monthly income of $250.00 which equals $3,000.00 annually as a sales associate at L.S. Ayres. According to Schedule A filed by the Greenes in their bankruptcy, the Greenes did not own any real estate. According to Schedule B filed by the Greenes in their bankruptcy, the Greenes owned two cars, a 1988 Cadillac Seville and 1999 Ford Windstar. According to Schedule D filed by the Greenes in their bankruptcy, the Greenes owed Dayair Credit Union for the 1999 Ford Windstar. According to Schedule B, Question 11, the Greenes own a Defined Retirement Plan through TIAA-CREF and St. Joseph's College in the amount of $13,000.00.

In his deposition of June 12, 2007, Frederick Greene stated that his income is "in the neighborhood of $44,000.00, seven, eight, $900.00, in that range." Docket Entry 53, Dep. of Frederick Greene, p. 9. Beginning with the 2007-2008 school year, Frederick Greene had been

promoted to associate professor at St. Joseph's College. Frederick Greene's salary from St. Joseph's College increases by one to three percent annually.

In her deposition of June 12, 2007, Terri Greene stated that her income is approximately $26,000.00 annually. In 2007, Terri Greene was employed as a School Case Manager at Wabash Valley Hospital.

The Greenes have now purchased their residence pursuant to a contract, and they no longer owe a debt on the 1999 Ford Windstar. Ten percent of Frederick Greene's salary is contributed to his TIAA-CREF retirement account.

The Greenes listed unsecured debt of $61,061.00 on Schedule F of their bankruptcy schedules. The Greenes received a discharge under 11 U.S.C. § 727 from the United States Bankruptcy Court on November 7, 2005. According to the docket of the Greenes' bankruptcy, no creditors opposed the Greenes' discharge, nor were any debts other than the student loans at issue
sought to be excepted from discharge.

According to Schedule J of the Greenes' bankruptcy schedules, the Greenes made charitable contributions of $300.00 each month. These charitable contributions were tithes to the Greenes' church, which were not a church requirement for membership.

In his deposition, Frederick Greene states he did not file a tort claim with the Department of Education on Standard Form 95. He does leave open the possibility that he filed a document that was similar or "the purposes that this form is intended to serve may not have been met by some other notice or filing." Docket Entry 53, Dep. of Frederick Greene, p. 37-38. No such filing has been identified. According to the Department of Education, neither Frederick Greene nor

Terri Greene has filed a Notice of Federal Tort Claim with the Department of Education.

According to Schedule J of the Greenes' bankruptcy schedules, the Greenes have an expense of $50.00 each month budgeted for payment of Frederick Greene's student loans to the Department of Education

Frederick Greene is 46 years old, and Terri Greene is 43 years old. Frederick Greene has a license to practice law from the State of Michigan and is in good standing. Frederick Greene is continuing to pursue a Masters Degree in Criminal Justice.

Frederick Greene earns additional income as a cellular phone salesperson at Sam's Club in Lafayette, Indiana, earning up to $600 each month.

Frederick Greene, Terri Greene, and their children are covered by health insurance.

On Schedule J of the Greenes' bankruptcy schedules, the Greenes listed an expense of $50.00 for miscellaneous expenses. On Schedule I, the Greenes list total monthly net income of $2,770.03, and on Schedule J, the Greenes list monthly expenses of $3,920.65.

Both Terri Greene and Frederick Greene submitted Affidavits in support of summary judgment, and Frederick Greene further submitted the Affidavit of his maternal uncle Eugene Gully.  In her Affidavit submitted in support of summary judgment, Terri Greene makes the following factual statements:

> 1. I am a Plaintiff in this case, and if called to testify I would testify as to the contents of this affidavit, made upon my personal knowledge and belief.
>
> 2. I was born in Lexington, Kentucky in 1964.
>
> 3. I am the descendent of slaves from the Richmond, Kentucky area, and if called to testify I can demonstrate my families [sic] and I [sic] historical and direct ties to slavery.
>
> 4. I attended schools in Lexington Kentucky until my graduation from high School

6

in 1982.

5. I attended Booker T. Washington Elementary School, a segregated elementary school in Lexington, Kentucky.

6. In 1982, I began my college level education at Kentucky State University (KSU) in Frankfort, Kentucky.

7. Kentucky Sate [sic] University is a Historically Black College or University (HBCU) founded in 1886.

8. Kentucky State University is a land grant institution, having received its land from the federal government.

9. KSU was founded to educate the freed slaves and the descendants of slavery.

10. At the time of my attendance at KSU, and to this day, KSU is engaged in the education of African American students, descendants of slaves.

11. Throughout the time I attended KSU, KSU was under-funded, and did not receive funding levels comparable to similarly situated Traditionally White Colleges (TWI's).

12. In 1983, while I was a student at KSU, the Kentucky General Assembly acknowledged that there had been vast discrepancies in the funding levels, and that KSU had been under-funded comparable to TWI's.

13. The United States and/or the Department of Education, and/or its predecessors continues to accredit and certify KSU as an institution of higher learning.

14. The US Government makes funds available to KSU through grants, funding, student loans, and various federal programs.

15. While attending KSU I received my first federally backed student loan.

16. For various reasons, particularly related to the segregated character of the school, lack of funding,[sic] I was unable to finish my degree at Kentucky State University.

17. My later student loans at Andrews University were accumulated as a result of my need to obtain a college degree, that I was unable to obtain at the federally funded, federally accredited, Historically Black College or University, Kentucky State University.

7

18. If called to testify I will more particularly testify about the factual issues concerning the reduced value of the education I received at KSU as well as the extra loans I was forced to receive as a result of this federally backed scheme of "separate but unequal."

19. I have personally suffered a concrete and particularized injury as a result of the US Department of Education's blessing, funding, support, accreditation and facilitation of this "separate but unequal" scheme of higher education.

20. I have a personal stake in this litigation in that the Department of Education's acts and failures have directly affected the high amount of student loans I now owe.

21. I am not seeking a judgment against the Department of Education, but am simply seeking to assert my affirmative rights relative to their claim that I owe them unpaid student loans and an adjudication from the courts as to what amount I may owe, if any, considering their claim, my defenses, and offsets.

. . . .

27. I am presently unable to pay any amount for student loans because of high expenses regarding the special education needs of my four children.

28. I struggle every payday to simply stay afloat and maintain a minimal standard of living now, without the added expense of these unfair student loan amounts.

29. I object to the usurious interest rates charged by the Department of Education in that the Department charges interest rates way above even commercially available loans.

30. If called to testify, I will more particularly address all of these facts and circumstances.

Aff. of Terri Greene.

The Affidavit of Frederick Greene at paragraphs 1, 4-12, 19-22, 28-30, and 40 restates paragraphs 1, 7-15, 18-21, 27-30 of Terri Greene's Affidavit. The remainder of Frederick Greene's Affidavit provides:

2. I am the descendant of slaves from the North Carolina and Mississipp [sic], and if called to testify I can demonstrate my families [sic] and My historical and direct ties to slavery.

3. In 1981 I attended college at Kentucky State University (KSU) in Frankfort Kentucky, where I graduated in 1984.

8

. . . .

13. After graduation I was "steered" to law school at the University of Kentucky (UK).

14. I was steered to UK because Kentucky schools were operating under a desegregation decree by the state legislature to accept more minorities at UK and more whites at KSU.

15. Resulting from this effort to integrate Kentucky Higher Education, I did not apply, nor was I advised or aware that my LSAT scores and undergraduate GPA were sufficient to apply at Ivy League schools and top 20 law schools.

16. I did not discover how high my LSAT scores were until 1998 while working at the University of Mississippi Law School, sitting on an admissions committee.

17. At that time, fourteen years after graduation from college and 11 years after graduation from law school, I discovered that I had been "used" by KSU and UK to help resolve their problem of segregation without regard to my personal capabilities and qualifications.

18. My student loan balances and ability to pay have been adversely impacted by these historical wrongs.

. . . .

31. The Department of Education has alleged that by virtue of my law license I can earn substantially more than the $40,000+ I now earn as a college professor.

32. From 1988 until 1997 I was engaged in the private practice of Law in Lansing, Michigan. I did not net in any of those years income in excess of my present earnings.

33. In each and every year while practicing law, and in each and every year since, I have attempted to find higher paying employment to no avail.

34. Law firms and corporations will not hire me because I am an older African American male.

35. Less than three percent of all lawyers in America are African American.

36. The legal profession has been called the last "bastion of segregation" because of the minimal number of black lawyers hired by silk stocking law firms.

37. I have inquired with the US Department of Justice about positions there where less than 1% of department lawyers are African Americans.

>38. I have been forced to maintain second jobs in areas far below my qualifications because of my inability to obtain higher paying employment.
>
>39. I am absolutely unable to afford student loan payments in that I can barely stay afloat with my present obligations.

Aff. of Frederick Greene.

>Finally, the Affidavit of Eugene Gully provides, in relevant part:
>
>4. I am the maternal Uncle of the Plaintiff, Frederick V. Greene.
>
>5. I am the older full brother of his mother Estella Greene.
>
>6. I was born in 06/27/1922 in East Saint Louis, Illinois.
>
>7. In 1927 My family, including the Plaintiff's mother moved back to our home in Mississippi.
>
>8. My father was James Gully, the grandfather of the Plaintiff.
>
>9. James Gully's father and mother were Henry and Rachel Gully, both grandchildren of slaves.
>
>10. In 1931 my father and family were run out of Mississippi because of racism by the Ku Klux Klan or a similar group, and the family fled north to Chicago in fear of their lives.
>
>11. Because of the discrimination and racism, the family was forced to leave Mississippi without even selling the family property which was close to 100 acres of land near Meridian, Mississippi.
>
>12. This land was lost because the family could not find protection from the federal or state government to protect them in going back to Mississippi.
>
>13. Our ancestral land is now worth substantial sums of money, that would have been passed down from generation to generation but for our ability to obtain protection from the federal government in protecting our civil rights.
>
>14. I am certain that some of the money from either the sale or continued farming or development of that land would have accrued to the benefit of my nephew the Plaintiff.

Aff. of Eugene Gully.

>In their Complaint against the Department of Education, the Greenes seek a

determination by the Court that their student loans are dischargeable in bankruptcy on several grounds. The Greenes argue that under 11 U.S.C. § 523(a)(8), their loans pose an undue hardship, and the allegation of undue hardship appears throughout the Complaint. The Greenes also argue that the statute of limitations has expired as to the collection of the loans, that the Government negligently charged the Greenes excessive interest and penalties, and that the loans should be discharged in bankruptcy as reparations for slavery and discrimination.

Count I, paragraph 11 of the Greenes' Complaint alleges that the collection of their student loans is barred by the applicable statute of limitations. Pursuant to 20 U.S.C. § 1091a, there is no limitations period for the collection of student loans, and the Greenes conceded this point in their summary judgment response brief. Accordingly, Magistrate Judge Cherry recommended that the Motion for Summary Judgment be granted as to Count I.

In Count II, paragraph 13 of their Complaint, the Greenes allege that their student loans should be discharged because the Government's negligence caused the assessment of excessive interest and penalties. The Government moved for summary judgment on the Greenes' negligence claim on the basis that, because the Greenes did not comply with the Federal Tort Claims Act, the Court is deprived of subject matter jurisdiction over any claim based on negligence.  Magistrate Judge Cherry found that there is no allegation in the Complaint that the Greenes filed a federal tort claim. The Government  submitted an Affidavit from the Department of Education providing that neither of the Greenes filed a tort claim with the Department. In addition, both of the Greenes testified at their depositions that they did not file a tort claim with the Department of Education. Because the Greenes have not complied with the FTCA in this case, the United States' sovereign immunity is not waived, and the Court lacks jurisdiction over

11

the Greenes' negligence claim. Accordingly, Magistrate Judge Cherry recommended that summary judgment be granted on the claim of negligence in Count II of the Greenes' Complaint.

In Count III, paragraph 16 of their Complaint, the Greenes allege that their loans constitute an undue hardship and that the loans, including principal, interest, and penalties, should be discharged "by virtue of reparations for slavery and discrimination due and owing" to them. Pl. Cmplt., ¶ 16. The Government sought dismissal of this claim on the basis that the Court lacks jurisdiction to hear the slavery reparations and discrimination claim, arguing that the Greenes lack standing, the statute of limitations has expired, and the Court should decline to hear this case under the political question doctrine. In addition, the Government argued that, to the extent the Greenes seek damages for the slave reparations as an offset against the student loans, such an action would be governed by the FTCA, and, as noted above, the Greenes have not filed any claim with the Government as a precondition to suit.

In their summary judgment response brief, the Greenes argued that the issue of slave reparations is within the jurisdiction of the Court by generally asserting "the relevant parts of their affidavits" and restating paragraphs 1-20 of Terri Greene's Affidavit. The Greenes also argued that the Court has the authority to "review actions by the Department of Education that may have violated individual civil rights."

After an extensive discussion, Magistrate Judge Cherry found that the Greenes did not meet their burden of establishing that they have standing to litigate their claim that their loans should be discharged as a form of slave reparations for their injuries alleged to be the result of slavery and resulting discrimination.

Magistrate Judge Cherry also found that, to the extent that Frederick Greene asserts in his

12

affidavit that some kind of misrepresentation in the course of his law school application process as a result of desegregation, the individuals or institutions involved in that process are not parties to this suit and ay claim against the Government on the basis of this misrepresentation can only be linked through the historical ties to slavery for which the statute of limitations has expired. Magistrate Judge Cherry further notes that this claim sounds in tort, and the Greenes have not complied with the FTCA.

In Count III, the Greenes alleged that their student loans should be discharged as a result of slavery reparations and discrimination. Magistrate Judge Cherry noted that there are no allegations in the Complaint of discrimination by the Department of Education. However, in his deposition, Frederick Greene clarified that the discrimination referenced in the Complaint has been an ongoing problem since the end of slavery, with the discrimination a direct result of the effect of slavery. In their summary judgment response brief, the Greenes argued that this Court has jurisdiction to review actions by the Department of Education "that may have violated individual civil rights." Magistrate Judge Cherry found, however, there are no allegations in the Complaint supporting a civil rights violation by the Department of Education against the Greenes. Nor did either of the Greenes identify any specific instance of discrimination by the Department of Education in their Affidavits. Thus Magistrate Judge Cherry found that the references to "discrimination" in the Complaint are intricately related to the slavery claims, as indicated by Frederick Greene in his deposition, and are to be analyzed simultaneously with the claims for slavery reparations.  Magistrate Judge Cherry concluded that the Greenes do not have standing to bring their slave reparation claim, the statute of limitations has expired for the claim, and the Greenes have not complied with the FTCA.  Accordingly, Magistrate Judge Cherry

13

recommended that this court grant summary judgment in favor of the Government on Count III of the Complaint.

Throughout their Complaint, the Greenes allege that the student loans, including interest and penalties, for which they are indebted to the United State Department of Education are an undue hardship on them individually and jointly. The Government argued on summary judgment that the Greenes cannot establish that the failure to discharge their student loans creates an undue hardship.

Under § 523 of Title 11 of the United States Code, an educational loan may be discharged in bankruptcy if it imposes an undue hardship:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
> . . .
> > (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit . . . unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor's dependents; . . . .

11 U.S.C. § 523(a)(8). The test to prove that student loans impose an "undue hardship," which is not defined in the Bankruptcy Code, requires that the borrower show: (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans. *Brunner v. New York Educational Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987); *see also Matter of Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993) (adopting the three-part *Brunner* test). To prevail

and demonstrate undue hardship, the Greenes are required to satisfy all three parts of the test. *See Brunner*, 831 F.2d at 396. The burden of proof that their loans should be discharged rests with the Greenes. *Roberson*, 999 F.2d at 1137. However, the Court in *Roberson* held that the first part of the test–whether the debtor can maintain a minimal standard of living if forced to repay the loans– is the starting point for the § 523(a)(8) analysis and is a prerequisite to the court examining the other two requirements of the *Brunner* test. *Id.* at 1135.

Both Terri Greene and Frederick Greene received Requests for Admissions from the Government in this case asking if repayment of the student loans would pose an undue hardship and also if they could afford to make reasonable payments on the loans. Neither timely answered the Requests for Admissions, and the Magistrate Judge Cherry found that the requests are now deemed admitted for purposes of this litigation. Magistrate Judge Cherry further found that default admissions may serve as the factual foundation for summary judgment. *Kasuboski*, 834 F.2d at 1350. Accordingly Magistrate Judge Cherry concluded that both Terri Greene and Frederick Greene have admitted and, therefore, it is conclusively established, that they can make reasonable payments on their loans and that the repayment of the student loans does not impose an undue hardship. Therefore, there was no genuine issue of material fact as to the first part of the *Brunner* test, Magistrate Judge Cherry recommended that summary judgment be granted in favor of the Government on the Greenes' claim that their student loan debt should be discharged as an undue hardship under 11 U.S.C. § 523(a)(8).

On November 13, 2007, the Greenes filed a Motion to File an Additional Response, asking the Court to permit the filing of a supplemental response brief to the Motion for Summary Judgment in order to address the impact on this litigation, if any, of the College Cost Reduction

15

and Access Act (the "Act"), which was signed into law on September 17, 2007. The Court granted the request, setting a deadline of January 14, 2008, for the filing of a supplemental brief. Rather than filing the brief, the Greenes filed a Request to Reopen Discovery in order to ascertain the legal impact of the Act on this case, which the Court denied.

Although the Greenes did not file an additional response brief addressing the impact of the Act on this litigation, Magistrate Judge Cherry briefly addressed the legal issues related to the Act mentioned by the Greenes in their Request to Reopen Discovery:

> First, the Greenes note that the Act allows for the forgiveness of certain types of student loans, including Federal Direct Stafford Loans, Federal Direct Plus Loans, Federal Direct Unsubsidized Loans, and Federal Direct Consolidation Loans, for "public service employees."
>
> Second, the Greenes note that the Act allows for loan forgiveness for teaching as, among others, a full-time faculty member at a Tribal College or University and other faculty teaching in high-needs areas, as determined by the Secretary. The Greenes question whether working at a private, nonprofit college or a hospital qualify the Greenes. Third, the Greenes sought to ascertain what impact the requirement of the Act that a borrower not be in default would have on their qualification for loan forgiveness under the statute
.
> Title IV of the Act, entitled "Loan Forgiveness for Public Services Employees," directs that the balance of any Federal Direct Loan not in default be cancelled for borrowers who, after October 1, 2007, have made 120 monthly payments under income-based or standard repayment plans while employed in certain public service jobs. *See* 20 U.S.C. § 1087e(m)(1). For purposes of the federal student loan program, the term "default" is defined as "only such defaults as have existed for (1) 270 days in the case of a loan which is repayable in monthly installments, or (2) 330 days in the case of a loan which is repayable in less frequent installments." 20 U.S.C. § 1085(l).
>
> Terri Greene has made no payments on her loan and Frederick Greene made a total of only $300 in loan payments over a period of approximately five to six months. The evidence of record reflects that neither is currently subject to a repayment plan as both rejected the Government's offers to restructure their loan payments. The Greenes are also in default on their loans. Therefore, whether or not their professions qualify under the definition of "public service job" under 20 U.S.C. § 1087e(m)(3)(2) or whether their loans are "eligible Federal Direct Loans" under 20 U.S.C.§ 1087e(m)(3)(1) are irrelevant.

16

Report and Recommendation at 37-38.

In their first objection, the Greenes take issue with the finding by the Magistrate Judge that the Bankruptcy Court's Order of April 25, 2006 did not stay the time period to answer to Requests for Admissions issued by the government. In their objection, the plaintiffs state, "[T]he Recommendation ignores the stay of proceedings issued by the Bankruptcy Court on April 25, 2006...".

The Government argues that the assertion that the Magistrate Judge ignored the April 25, 2006 Order is not accurate and points out that the Magistrate Judge cites the April 25, 2006 Order on page 8 of his Report and Recommendation and, in fact, quotes the entire Order.

The government attached a certified copy of the Bankruptcy Court Order of April 25, 2006 to its Reply Brief filed October 3, 2007. The Order is Exhibit 13. The Order was entered by the Bankruptcy Court after the plaintiffs filed their Motion for Withdrawal of Reference but failed to pay the required fee. The Court stated:

> ORDERED that plaintiff shall fully pay the required fee within eight (8) days of this date. The failure to do so will result in the current filing being stricken with further notice. The court will take no further action with regard to the current filing and any time limits associated with it, e.g. 11 U.S.C. 362(e), shall not begin to run until this order has been complied with.

This court agrees with the Government that the Order did not suspend the time to answer the Requests for Admissions. Rather, it suspended the time for responding to the plaintiffs' motion to withdraw reference, as it clearly references the "current filing", i.e. the Motion to Withdraw Reference.

At paragraph 2 of the Greenes' objections, the Greenes take issue with the Magistrate Judge's finding that their answers to the Requests for Admission were admitted because the responses were filed after the deadline. The Government points out that the Greenes do not cite any support for their position that the Magistrate Judge or this Court can ignore the time limits contained in Federal Rule of Civil Procedure 36(a).

At paragraph 3 of the Greenes' objections to the Report and Recommendations, the Greenes assert that their complaint is a civil rights complaint and that the Magistrate Judge failed to analyze the plaintiffs' complaint as such. The Government notes that the Greenes do not specify, as required by Federal Rule of Civil Procedure 72(b), where their complaint alleges a civil rights violation.  The term "civil rights" does not appear in their complaint. Nor does the complaint cite to 42 U.S.C. 1983 or Title VII of the Civil Rights Act of 1964, provisions cited by plaintiffs in their objections. Plaintiffs were the master of their suit and free to decide what law was relied upon. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, f. 7 (1987) *quoting The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913). Trial courts should not have to guess at the nature of a suit. *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1990). Simply stated, the complaint does not allege a cause of action for violation of plaintiffs' civil rights.

The Greenes have attached the Civil Cover Sheet to their objections. However, this court agrees with the Government that the fact that plaintiffs checked a box indicating the nature of the suit was "Other Civil Rights" does not give rise to a civil rights cause of action where such an action is not pled in the complaint.

The Greenes take issue with the finding in the Report and Recommendation that their complaint cannot assert affirmative defenses. Again, the Greenes do not cite to law or

18

facts in the record which call the Report and Recommendation into question. As the Government points out, Federal Rules of Civil Procedure, Rule 8(c), make clear that affirmative defenses are defenses that may be raised in responding to other pleadings. It follows that the Greenes' complaint, which is not a responsive pleading, cannot allege affirmative defenses.

At paragraph 5, the Greenes object to the Report and Recommendations because they believe that there should be no statute of limitation period for defenses to the collection of student loans. Again, the Greenes fail to provide this Court the reason why this assertion, if true, would require a different result. Presumably, the Greenes are referring to the finding that their slavery reparations claim would be barred by the statute of limitations and cannot be used to offset their student loan debt. Even assuming that the Greenes are correct, there are other grounds listed by the Magistrate Judge to reject the slavery reparations assertions.

At paragraph 6, the Greenes assert that the Report and Recommendation is incorrect because it interprets their negligence claim as a tort claim. Again no law is cited to support the position that negligence claims are not tort claims. There is no citation to any fact in the record supporting the Greenes' assertions. Nor do the Greenes explain why their objection, if true, requires a different result.

Accordingly, the court will deny the objections to the Report and Recommendation.

## Conclusion

On the basis of the foregoing, the Greenes' Objection to Report and Recommendation is hereby DENIED.  Further, the court hereby ADOPTS the February 7, 2008 Report and

Recommendation and hereby GRANTS the government's Motion for Summary Judgment.

Entered: March 27, 2008.

s/ William C.  Lee
William C. Lee, Judge
United States District Court
